**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 23-4250**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ABDUL INUSAH,

Defendant - Appellant.

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington.  Robert C. Chambers, District Judge.  (3:21-cr-00070-1)

Submitted:  January 10, 2024                                    Decided:  March 18, 2024

Before WYNN, HARRIS, and QUATTLEBAUM, Circuit Judges.

Affirmed by unpublished opinion. Judge Harris wrote the opinion, in which Judges Wynn and Quattlebaum joined.

**ON BRIEF:**  Shawn A. Morgan, STEPTOE & JOHNSON PLLC, Bridgeport, West Virginia, for Appellant.  William S. Thompson, United States Attorney, Holly J. Wilson, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PAMELA HARRIS, Circuit Judge:

A jury convicted Abdul Inusah of multiple charges related to an international romance fraud scheme. On appeal, Inusah challenges both his conviction and his sentence of 24 months' imprisonment. Finding no reversible error, we affirm the judgment of the district court.

## I.

Abdul Inusah moved from Ghana to attend graduate school in West Virginia. There, he began to act as a middleman in an international romance fraud scheme that functioned as follows: People in Africa would create false online personas and use them to offer love and affection to victims. After some invented crisis – the death of a parent, an emergency medical condition – the victims would be persuaded to send large sums of money, sometimes adding up to entire life savings, to their false online partners. But instead, their money went to middlemen or "money mules," typically in the United States, who would accept the funds from the victims, keep a percentage as payment for their involvement, and then forward the rest of the money to the fraudsters abroad.

The role of the middleman was critical to the scheme's success. Large wire transfers to African countries can raise concerns at United States banks. By instructing victims to send money instead to domestic middlemen, the fraudsters sought to avoid suspicion. And by maintaining multiple accounts and quickly moving victims' money from account to account, the middlemen sought to avoid fraud detection measures and frozen or closed bank accounts.

2

**A.**

A federal grand jury in the Southern District of West Virginia indicted Inusah on multiple counts for his role in the scheme, including wire fraud, *see* 18 U.S.C. § 1343; receipt of stolen property, *see* 18 U.S.C. § 2315; and conspiracy to commit money laundering, *see* 18 U.S.C. § 1956(h). During a four-day jury trial, the government presented testimony from six victims and from a government financial analyst who summarized bank records showing transfers from the victims to Inusah's multiple accounts. The government also called three of Inusah's fellow middlemen,[1] who testified to Inusah's role in the scheme and his knowledge of its unlawful nature.

At the end of the government's case-in-chief, Inusah moved for a Rule 29 judgment of acquittal, *see* Fed. R. Crim. P. 29, arguing that the government had not proven that he had the requisite intent to defraud or knowledge of the fraudulent scheme. The district court denied the motion:

> [The government has] produced direct evidence from the testimony of co-conspirators that Mr. Inusah knew, as they did, that this money was coming as a result of a fraudulent scheme. . . .
>
> The government has demonstrated that very substantial deposits were made into Mr. Inusah's account, in his name . . . . The evidence is that the money originated from the victims of the fraud. They testified as to that. There were substantial amounts of money. The money was then handled by the defendant in a manner consistent with the testimony of the co-conspirators, that they attempted to do relatively rapid transactions, use multiple bank accounts, move the money among and through these various accounts as quickly as possible and keep some of it. And so I think all of that is sufficient

---

[1] The other middlemen – Kenneth Emeni, John Nassy, and Kenneth Ogudu – were charged separately, pleaded guilty, and agreed to cooperate with the government.

3

to show the defendant's knowledge and intent with respect to each of the counts.

J.A. 446-47.

Inusah then testified on his own behalf, contending that he was unaware that the tens of thousands of dollars deposited into his accounts were fraudulently obtained; instead, he said, he believed he was simply doing favors for Ghanaian acquaintances attempting to purchase cars. The next day, the jury convicted Inusah on four counts: two counts of wire fraud, one count of receipt of stolen money, and one count of conspiracy to launder money.[2]

**B.**

Before Inusah's sentencing, the probation office prepared a presentence investigation report calculating an advisory sentencing range of 30 to 37 months' imprisonment. That range was based on an offense level of 19, which reflected a 10-level enhancement under U.S.S.G. § 2B1.1 for a total loss amount of more than $150,000 but not more than $250,000. Inusah objected to the loss calculation on multiple grounds.

At sentencing, the district court found that the government had provided sufficiently reliable evidence of loss and adequately supported a total loss amount of $152,000. The court rejected Inusah's argument that a $20,000 deposit into one of his bank accounts should be excluded because the government had not established "venue" by proving the account was in the Southern District of West Virginia. J.A. 825-26 (explaining that there

---

[2] The jury acquitted Inusah of two counts of unlawful monetary transactions, *see* 18 U.S.C. § 1957, and one charge of aggravated identity theft, *see* 18 U.S.C. § 1028A, in connection with his creation of a bank account in the name of his ex-girlfriend.

4

is no venue requirement for loss amounts at sentencing).  And the court also denied Inusah's objection to including $24,000 in funds related to conduct for which he was acquitted, citing the "current state of the [G]uidelines and the law."  J.A. 822.

That left the district court with the same offense level of 19 and Guidelines range of 30 to 37 months calculated by the PSR.  But the court, noting challenges to the use of acquitted conduct at sentencing, used its discretion to vary downward as if the $24,000 in loss from acquitted conduct had been excluded.  This "prophylactic exercise," J.A. 823, led to an alternative range of 24 to 30 months' imprisonment.  The district court ultimately sentenced Inusah to 24 months in prison – the bottom of its alternative Guidelines range – along with restitution and a term of supervised release.

This timely appeal followed.

## II.

### A.

In challenging his conviction, Inusah focuses primarily on the sufficiency of the evidence against him, arguing that the district court erred in denying his Rule 29 motion for a judgment of acquittal.  He also takes issue with certain evidentiary determinations by the district court and a jury instruction on willful blindness.  Finding the evidence more than sufficient and no error by the district court, we affirm Inusah's conviction.

1.

5

"We review de novo the denial of a Rule 29 motion for judgment of acquittal."[3] *United States v. Dinkins*, 691 F.3d 358, 387 (4th Cir. 2012). "A defendant challenging the sufficiency of the evidence faces a heavy burden." *United States v. Foster*, 507 F.3d 233, 245 (4th Cir. 2007). We review the evidence and the inferences to be drawn from it in the light most favorable to the government. *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). And Inusah can prevail only if no "rational trier of facts could have found [him] guilty beyond a reasonable doubt." *Id.*

Inusah admits that there is record evidence showing fraud victims' money entering his bank accounts. His claim on appeal – as before the district court on his Rule 29 motion – is that the government did not prove he acted with the specific intent to defraud or that he knew the money entering his account was stolen or otherwise illegally derived, as all agree was required to sustain his convictions.[4] But like the district court, we conclude that

---

[3] We note that Inusah, after moving for acquittal at the close of the government's case in chief, did not renew his Rule 29 motion at the close of all evidence or after trial This raises the question of whether we should instead review Inusah's sufficiency claim only under a "manifest miscarriage of justice" standard. *See United States v. Fall*, 955 F.3d 363, 374 (4th Cir. 2020) (quoting *United States v. Chong Lam*, 677 F.3d 190, 200 & n.10 (4th Cir. 2012)). The government does not address this issue and instead urges us to apply de novo review. Because we conclude below that Inusah cannot prevail even under the usual de novo standard, we do not further address this issue.

[4] There is no dispute that Inusah's convictions for wire fraud under 18 U.S.C. § 1343 required the government to prove "specific intent to defraud," *see United States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008); his conviction for receiving stolen property under 18 U.S.C. § 2315, that he knew the property was stolen, *see United States v. Jones*, 797 F.2d 184, 186 (4th Cir. 1986); and his conviction for money laundering conspiracy under 18 U.S.C. § 1956(h), that he knowingly entered into the conspiracy and knew the laundered money was illegally derived, *see United States v. Alerre*, 430 F.3d 681, 693-94 (4th Cir. 2005).

there is ample evidence – both "direct evidence from the testimony of co-conspirators" and "strong circumstantial evidence" – to support Inusah's convictions.  J.A. 446-47.

First, this is the somewhat unusual case in which the government was able to present direct evidence of the requisite state of mind.  *Cf. United States v. Santos*, 553 U.S. 507, 521 (2008) (explaining that government customarily proves knowledge with circumstantial evidence).  As the district court emphasized, three cooperating middlemen gave testimony speaking directly to Inusah's knowledge of the fraudulent scheme.  One witness, for instance, testified that when he asked Inusah to accept a victim's funds because his own bank account was closed, Inusah "knew it was a fraudulent transaction."  J.A. 274-75.  Another testified that when he was approached about joining the scheme, he went to Inusah for advice as one of "the people who [was] involved . . . . in these schemes" who "seemed to know more about the whole scheme and how money got into our bank," and then received Inusah's guidance on how to protect himself from law enforcement.  J.A. 214-16.  There is more, and while Inusah suggests that the testimony of his fellow middlemen was not credible, that was a determination squarely for the jury.  *See Dinkins*, 691 F.3d at 387 ("In our review of a Rule 29 motion, we remain cognizant that it is the jury's province to weigh the credibility of the witnesses.").

Second, we agree with the district court that strong circumstantial evidence also supported the jury's determination that Inusah acted with the requisite knowledge and intent.  Inusah's bank records showed that he handled the victims' funds in a manner consistent with middlemen techniques:  He had multiple accounts at multiple banks, into which victims transferred their funds; he quickly moved and shuffled the funds through his

7

multiple accounts; and he asked his ex-girlfriend to open a bank account on his behalf that was used to receive funds from victims. A jury crediting that evidence could find that Inusah was using these tactics to further the goals of the conspiracy.

In short, crediting the government's witnesses and drawing all reasonable inferences in the government's favor, we conclude that the government presented ample evidence from which a jury could find, beyond a reasonable doubt, that Inusah had the knowledge and intent necessary to support his convictions. *See United States v. Ali*, 735 F.3d 176, 188-91 (4th Cir. 2013). The district court did not err in denying Inusah's motion for judgment of acquittal.

2.

Inusah also raises two evidentiary challenges, which we review for abuse of discretion if preserved at trial, or plain error if not preserved. *United States v. Walker*, 32 F.4th 377, 394-95 (4th Cir. 2022).

The first involves admission into evidence of a summary chart compiling various financial records showing transfers to and from Inusah's multiple bank accounts. Under Federal Rule of Evidence 1006, a summary chart may be used "to prove the content of voluminous" records that "cannot be conveniently examined in court." Fed. R. Evid. 1006. To comply with this rule, a chart must be an "*accurate* compilation" of the records it summarizes, and the underlying records must be made available to opposing counsel reasonably in advance. *See United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004); Fed. R. Evid 1006. Although the underlying records must be admissible in evidence, they need

8

not actually be introduced at trial; rather, the "chart itself is admitted as evidence in order to give the jury evidence of the underlying documents." *Janati*, 374 F.3d at 273.

The district court did not abuse its discretion in admitting the chart at issue here. On appeal, Inusah argues only that the chart was "inaccurate and misleading" because it shows wire transfers from two victims to Inusah's accounts without citing to admitted trial exhibits as support. But as described above, Rule 1006 does not require that documents underlying a chart themselves be admitted as trial exhibits. Indeed, the whole point of Rule 1006 is to "reduce the volume of written documents that are introduced into evidence" by admitting a summary chart *instead* of the documents. *Janati*, 374 F.3d at 272. Apart from this misplaced argument, Inusah does not challenge the factual accuracy of the chart, and he does not dispute that the underlying records were produced to him in discovery. The district court properly admitted the chart at trial.[5]

Inusah next challenges the testimony of a government analyst which, he argues, extended beyond the analyst's personal knowledge, imputing certain financial transactions involving Inusah's accounts to Inusah himself without support. This is an unusual appellate contention in that the district court agreed with Inusah at trial, sustaining an objection on this ground and cautioning the government to "avoid having [the witness]

---

[5] The government asks that we review this claim for plain error only because Inusah did not object to the chart's admission on this ground before the district court. We are inclined to agree that Inusah forfeited this claim in the district court. But it matters not to the disposition of this appeal, because we find no error, plain or otherwise, in admission of the chart.

attribute these transactions directly to the defendant unless you've got some other evidence . . . that specifically ties the actual transaction to the defendant himself." J.A. 352-53.

Undeterred, Inusah argues on appeal that the district court later overruled a similar defense objection. But in that instance, there was indeed evidence "specifically [tying] the actual transaction to the defendant himself," *id.*, in the form of a signed withdrawal slip, and so the objection was unfounded. Inusah also points to testimony in which the witness, asked whether Inusah used his debit card on a certain date, answered that he did. But Inusah did not object to that question by the government – and when he did object to the government's follow-up question, the district court sustained that objection, as well. On this record, we find no reversible error by the district court.

3.

Finally, Inusah argues that the district court erred when, over his objection, it gave a willful blindness instruction to the jury. Inusah is correct that "caution must be exercised in giving a willful blindness instruction," which "is appropriate only in rare circumstances." *Ali*, 735 F.3d at 187. But one is merited when "evidence supports an inference of deliberate ignorance" by tending "to show that (1) the defendant subjectively believes that there is a high probability that a fact exists and (2) the defendant took deliberate actions to avoid learning of that fact." *United States v. Miller*, 41 F.4th 302, 314 (4th Cir. 2022) (cleaned up). We review the district court's decision to give this instruction for abuse of discretion, *id.*, and find none here.

First, we note that the court carefully tracked the applicable standard in its instruction, informing the jury that it could treat "deliberate avoidance as the equivalent of

10

knowledge" only if it found, beyond a reasonable doubt, that the "defendant deliberately and consciously avoided confirming [a] fact so he could deny knowledge if apprehended." J.A. 551. And it expressly cautioned that knowledge could *not* be inferred from mere "negligence, carelessness, or a belief in an inaccurate proposition," *id.* – a caution we have relied on to sustain the giving of a willful blindness instruction in the past. *See Ali*, 735 F.3d at 188.

Second, there was indeed evidence from which Inusah's jury could draw an inference of deliberate ignorance. Inusah contended that he was unaware of the fraudulent nature of the tens of thousands of dollars entering his bank accounts. But that could have been so only if Inusah "ignored warning signs" that something was badly amiss, *see id.*, including, most obviously, the fact that banks closed several of his accounts and that he needed to have someone else (his then-girlfriend) open an account on his behalf. And Inusah's failure to investigate the source of the huge sums of money flowing into his accounts, or even to speak to the individuals sending the money, could be viewed by a reasonable jury as a deliberate effort to avoid confirming what Inusah suspected – especially in light of a fellow middleman's testimony that "[i]n this situation, the less you ask, the better it is for you." J.A. 230. Under these circumstances, the district court did not abuse its discretion in giving a willful blindness instruction.

**B.**

With respect to his sentence, Inusah argues that the district court erred in determining his Guidelines sentencing range by applying a 10-point loss enhancement under § 2B1.1(b), based on a total loss calculation of $152,000. *See* U.S.S.G.

11

§ 2B1.1(b)(1)(F) (providing for 10-point enhancement for losses greater than $150,000 but not greater than $250,000).  We review the calculation of a Guidelines range de novo, but the underlying "determination of loss attributable to a fraud scheme is a factual issue" reviewed for clear error.  *United States v. Rand*, 835 F.3d 451, 467 (4th Cir. 2016) (quoting *United States v. Keita*, 742 F.3d 184, 191 (4th Cir. 2014)).

Measured by dollar amount, Inusah's primary argument is based on the adequacy of the evidence bearing on loss:  According to Inusah, the government failed to prove by a preponderance of the evidence a total of $95,000 in losses connected to four victims.  But the district court carefully considered the evidence related to these victims, holding the sentencing hearing in abeyance for supplemental briefing regarding the loss calculations.  The court then determined that the government's evidence – including the summary chart discussed above, the records underlying the chart, and memoranda from victim interviews – was sufficiently reliable and adequately supported a loss calculation of $152,000.  We find no error, let alone a clear error, in the district court's loss calculation.

Inusah also argues, as he did before the district court, that $20,000 should be excluded from the loss amount because the government failed to establish "venue" over the bank account that received those funds.  The district court rejected this argument, and properly so.  A sentencing court may broadly consider "relevant conduct," including acts "willfully caused by the defendant" and "all harm" resulting therefrom.  U.S.S.G. §1B1.3.  There is no venue requirement for related conduct.  *See United States v. Hodge*, 354 F.3d 305, 312-15 (4th Cir. 2004) (affirming Guidelines calculation that included weight from out-of-state drug buy as "relevant conduct").

12

Finally, noting ongoing debates about the propriety of basing sentencing enhancements on acquitted conduct, *see*, *e.g.*, *United States v. Brown*, 892 F.3d 385, 408-09 (D.C. Cir. 2018) (Millett, J., concurring), Inusah contends the district court erred by including in its loss calculation $24,000 related to counts of which he was acquitted.  But this panel is bound by precedent holding that a court may consider such conduct if proved by a preponderance of the evidence.  *See United States v. Lawing*, 703 F.3d 229, 241 (4th Cir. 2012) (citing *United States v. Watts*, 519 U.S. 148, 157 (1997)).  Inusah has preserved the issue, but it is not one on which we may grant relief.[6]

## III.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*

---

[6] The government argues that any error in this respect would in any event be harmless, given the district court's discretionary decision to sentence Inusah consistent with an alternative and lower Guidelines range that excluded loss associated with acquitted conduct.  Because we hold that no error occurred, we need not address this alternative argument.

13