**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

No. 21-4088

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

CHARLES ANTHONY WALKER, JR., a/k/a Supreme, a/k/a Preme,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at New Bern. Louise W. Flanagan, District Judge. (2:18-cr-00037-FL-1)

Argued: March 11, 2022                          Decided: April 27, 2022

Before THACKER, RICHARDSON and RUSHING, Circuit Judges.

Affirmed by published opinion. Judge Thacker wrote the opinion, in which Judge Richardson and Judge Rushing joined.

**ARGUED:** Thomas Kieran Maher, AMOS TYNDALL PLLC, Carrboro, North Carolina, for Appellant. Kristine L. Fritz, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Amos G. Tyndall, AMOS TYNDALL PLLC, Carrboro, North Carolina, for Appellant. G. Norman Acker, III, Acting United States Attorney, David A. Bragdon, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

THACKER, Circuit Judge:

After a five-day trial, a jury found Charles Anthony Walker, Jr. ("Appellant") guilty of conspiracy to commit Hobbs Act robbery, two counts of Hobbs Act robbery, brandishing a firearm during the commission of a crime of violence, and witness tampering. Appellant challenges those convictions, asserting that the district court erroneously admitted certain evidence during the trial and that the evidence against him was insufficient to sustain the witness tampering conviction.[1]

Although we agree with Appellant that some of the evidence the jury heard during the trial should have been excluded, we conclude that the remaining evidence supporting Appellant's guilt was so overwhelming that the erroneously admitted evidence did not affect the trial's outcome. We further hold that the district court properly denied Appellant's motions for a judgment of acquittal on the witness tampering charge. Accordingly, we affirm Appellant's convictions.

---

[1] Appellant also argues that his total offense level at sentencing should not have included a four-level enhancement for abduction of victims. However, he concedes that this argument is foreclosed by our decision in *United States v. Osborne*, 514 F.3d 377 (4th Cir. 2008). Appellant's Opening Br. at 46. Therefore, we need not discuss it further.

I.

A.

Facts Adduced at Trial

We recite the facts adduced at trial in the light most favorable to the United States (the "Government"), which prevailed in the district court. *United States v. Bush*, 944 F.3d 189, 191 n.1 (4th Cir. 2019).

1.

Events Preceding Robberies

In 2018, Appellant was planning to rob a Rolex store in Virginia Beach, Virginia, and he recruited Joey Wayne Chambers ("Chambers") and Malik Shawn Maynard ("Maynard") -- who then recruited Christopher Wellington Brown ("Brown") -- to help him. Appellant had been friends with Chambers for several years. Appellant met Maynard while Appellant was in prison, and they reconnected upon Appellant's release. Brown met Maynard shortly after being released from prison in May 2018, and Maynard introduced Brown to Appellant.

Appellant was also acquainted with Byron Jacobee Sparks ("Sparks"). He knew that Sparks would sell drugs in exchange for vehicles and had previously asked to buy a vehicle from Sparks "a couple times." J.A. 408.[2] Sparks offered to sell Appellant a blue Mazda minivan that had been "shot up" and had bullet holes and a busted window. *Id.* at 410. Appellant wanted to buy the minivan, and he paid for it with some cocaine and "a

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

little cash" but "was still kind of short on the money." *Id.* at 409. Sparks initially refused to give Appellant the vehicle until he paid in full, but when Sparks was out of town, Appellant called him saying he needed the vehicle. Sparks decided to give the minivan to Appellant even though he still owed the rest of the agreed-upon price. He had the van delivered to Appellant.

On July 12, 2018, Appellant and Ladammingo Baldwin ("Baldwin"), an ex-girlfriend who was incarcerated at the time, spoke on the phone. Their call was recorded. During the call, Appellant told Baldwin, "I should have to . . . go in because it's my lineup and it's my tools they using." S.J.A. 979.[3] He commented, "[W]e going straight to the back room." S.J.A. 980. Appellant also told Baldwin, "I gotta have my mind and focus on . . . what the mission is. . . . I gotta focus on what I gotta do because I got people's lives in my hands . . . as well as my own." *Id.*

On the day before the robbery of the Virginia Beach Rolex store was supposed to take place, Appellant picked up Brown and Maynard from their apartment in Carrboro, North Carolina. Appellant then bought them clothing to wear during the robbery and gave them guns to use. The three of them spent the night at Appellant's apartment in Greensboro, North Carolina.

On the morning of July 28, 2018, Appellant directed Brown and Maynard to a minivan "with a busted left driver's side passenger window," J.A. 228–29, with "a black

---

[3] Citations to the "S.J.A." refer to the Supplemental Joint Appendix filed by the parties in this appeal. S.J.A. 979 and 980 are placeholders for audio exhibits that are on file with the Clerk of Court.

bag on it," *id.* at 311. Appellant picked up Chambers, and they rode together in Appellant's Mercedes SUV, and Brown and Maynard followed them in the minivan to the Rolex store in Virginia Beach. On the way there, they stopped at a gas station, where Appellant bought Bluetooth earpieces so that the group could communicate during the robbery.

When they arrived at the Rolex store, Appellant, Brown, and Maynard went inside. The three of them "walked around that store for quite a while trying to figure out how it would be possible to [rob] it." J.A. 229. However, Brown and Maynard "got spooked" because "[t]here were too many people." *Id.* at 309. The threesome ended up leaving the Rolex store without robbing it. But Appellant told the group to follow him to another jewelry store in Elizabeth City, North Carolina, where they could execute the robbery. Brown and Maynard then followed Appellant to the second store.

2.

First Robbery (July 28, 2018)

a.

When Appellant, Chambers, Brown, and Maynard arrived at the jewelry store in Elizabeth City, Appellant directed Brown and Maynard to go inside and "make sure that the conditions for this particular robbery would work, meaning that it wasn't too many people there, meaning that there was no security, meaning it would be simple to do; there wouldn't be any trouble." J.A. 234. Appellant gave Brown a fake Rolex watch to use as a prop when he and Maynard went inside. Appellant also gave Brown a credit card, and Brown "was supposed to mention that [he] needed to check [his] balance before he made

5

a purchase, so [he and Maynard] would come back." *Id.* at 235. Appellant gave Maynard a Bluetooth earpiece so that they could communicate with each other.

At the time of the robbery, only Karen Swain ("Swain"), who was the store's assistant manager, and Tiffani Bene ("Bene") were working. It had been an "extremely slow" day with only a few customers. J.A. 115. Around 8:00pm, Brown and Maynard entered the store, and Bene greeted them. Swain thought "they acted a little sketchy." *Id.* at 124. Brown and Maynard approached Bene and expressed interest in a watch. Bene chatted with them for several minutes and removed one of the watches from the jewelry case. Brown told Bene that he needed to leave to "check his bank card," and he and Maynard left the store without purchasing anything. *Id.* at 72.

Brown and Maynard then went to where Appellant was waiting in the parking lot and told him that they "didn't really know what to take" from the store. J.A. 315. Appellant decided that he would go into the store to look around and would call Maynard to signal that Brown and Maynard could return to the store to rob it. While Appellant was inside the store, Brown and Maynard sat in the minivan and waited for him to call.

When Appellant entered the store, he asked to look at engagement rings. Bene took a ring out of the case and handed it to Appellant. She called Swain over to assist her in answering a question Appellant asked about diamonds, and Swain chatted with Appellant. Bene thought that Appellant did not seem "interested" in the ring, "even though he was . . . asking questions." J.A. 76. She observed that "he stood very far back from the cases." *Id.*

6

Then, Appellant called Maynard, but he told Bene and Swain that he was receiving a call from "his lady." J.A. 76. Appellant said, "I have it right now, babe. I'm looking at it right now, babe. I'm looking at it right now, babe." *Id.* At that point, Brown and Maynard came back inside the store with guns. Appellant "made [a] little noise and threw his hands up." *Id.* at 77. Based on her observations, Swain believed Appellant was "just a little bit trying to . . . act like he was afraid." *Id.* at 119. Appellant did not leave the store right away. When he did leave, Bene and Swain "thought he was going to get [them] help," but no help arrived until after they called the police themselves. *Id.* at 78. Bene believed Appellant "was the decoy guy" for the robbery. *Id.* at 89.

Brown and Maynard led Bene and Swain to the back room of the store, where the store's safe was located. Maynard asked for the money in the safe, but Swain explained to him that the safe contained only merchandise. Maynard then demanded the contents of the safe, which Swain gave to him. Meanwhile, Brown directed Bene to the jewelry case with the engagement rings, where she had just been talking to Appellant, and instructed her to hand him certain rings. Maynard forced Swain to give him the money from the cash register. He also took chains and bracelets from the case containing men's jewelry. In total, Brown and Maynard made off with $300,000 worth of merchandise.

Brown then directed Bene to the back room of the store, where he handcuffed her. Maynard brought Swain to the back room, and she and Bene were left there alone. Eventually, Bene and Swain exited the back room and called the police.

Upon questioning by the Government, Bene testified at trial that the robbery "changed [her] life." J.A. 84. She stated:

7

> Well, I'm mentally messed up. I don't trust anyone. I don't
> like to talk to anyone. I don't like to go out by myself. I lost
> my marriage because I don't want to be touched. And my kids
> lost their mom because I can't touch them the way they need
> to be touched, and love them, and do things with them. I'm
> working on it. I'm in counseling.

*Id.* Bene further testified that she had not worked since the day of the robbery "[b]ecause I'm scared." *Id.* at 85.

Swain also testified that the robbery "changed [her] life tremendously." J.A. 124. She stated:

> It was hard for a long time. I stayed in my house, doors locked,
> blinds closed. I didn't go anywhere until my husband got home
> from work so he could take me wherever I needed to go. I no
> longer trust people. If you're not in my immediate family,
> you're not trustworthy. If you're not my husband, you're not
> trustworthy. Loud noises bother me. I was at [a] gas station;
> a sign blew over; I thought somebody had me; I thought I was
> gone. . . . I do go on every day because I have to survive; I
> have to live. I refuse to play a victim, because I am a survivor.

*Id.* at 123–24.

### b.

After the robbery, Brown and Maynard left the store and went to the parking lot, where Chambers was supposed to be waiting for them in the minivan. However, Chambers was not there, so Maynard got into Appellant's vehicle with him, and Brown followed them in the minivan. The threesome drove to a hotel next to a fast-food restaurant in Edenton, North Carolina. Appellant instructed Brown and Maynard to clean out the minivan and abandon it in the restaurant's parking lot. Appellant also gave them a change of clothes.

8

He directed Chambers, who had been in a sporting-goods store during the robbery and was still in Elizabeth City, to call a cab and come to the hotel in Edenton. Once Chambers arrived at the hotel, the four of them left the area in Appellant's Mercedes SUV.

On their way back to Appellant's apartment in Greensboro, Appellant's SUV ran out of gas on the side of the highway near Zebulon, North Carolina. Appellant directed Brown and Maynard to sit in the front seats of the SUV while he and Chambers walked to a gas station. After about 15 minutes, Appellant called Maynard and told Brown and Maynard to get the jewelry and the guns out of the SUV and stash them in the woods next to the road. Brown and Maynard gathered up the items and put them into bags Appellant had given them for the robbery, and Brown "took those bags across the soft shoulder and into the tree line." J.A. 251. Because it was dark, Brown tied "a white charger cord[] to a tree so that [they] could find where [they] had put this stuff." *Id.* at 252.

Before Appellant and Chambers returned with the gas, a police officer pulled up behind the SUV and asked Brown and Maynard if they were all right. Brown and Maynard told the officer that they had run out of gas and that two other people with them were going to get more. The officer left and came back a short time later with Appellant, Chambers, and a full can of gas. The officer then followed them to a gas station, where they filled up the vehicle with gas, bought some things in the convenience store, and left heading west toward Greensboro, where they had told the officer they were going. After the officer stopped following them, the foursome turned around and headed back east to the spot where Brown had hidden the guns and jewelry. Although they retrieved their loot, they left the phone charger tied around the tree.

9

With the jewelry and guns secured, the foursome again traveled west toward Greensboro. Appellant dropped Chambers off, and Appellant, Brown, and Maynard went back to Appellant's apartment in Greensboro. Once they arrived, they divided the jewelry between them. They stayed the night at Appellant's apartment.

The next day, Appellant, Brown, and Maynard went to a jewelry store in a nearby mall where Appellant had arranged for them to sell the jewelry from the robbery to a "fence" -- a person who buys stolen merchandise -- named Adel Salehani ("Salehani"). Each of them sold jewelry to Salehani. However, Appellant did not sell all of his share. When Sparks got back in town, he called Appellant and asked for the money Appellant still owed him for the minivan. Appellant offered Sparks the amount he owed him or four rings from the robbery, and Sparks chose the rings. Appellant also gave two rings and a bracelet from the robbery to a woman he knew.

3.

Second Robbery (October 11, 2018)

a.

On October 7, 2018, an employee at a cellphone store in Garner, North Carolina, noticed a suspicious vehicle in the parking lot at the shopping center where the store was located. The employee thought it was strange that the vehicle was parked there all afternoon with people sitting inside, so he took some photographs of the vehicle. The vehicle -- a dark gray Infiniti sedan with tinted windows -- belonged to Appellant.

Four days later, on October 11, 2018, Maynard contacted Brown to tell him that Appellant was planning another robbery. Appellant approached Maynard because the

10

other people who were supposed to execute the robbery "got spooked." J.A. 329, 393. Appellant picked Brown and Maynard up and drove them to the Kay Jewelers next door to the cellphone store in his "dark-colored Infinit[i] sedan." *Id.* at 260. He gave them reflective orange vests, one real gun and one prop gun, and brown pillowcases to place the jewelry in.

Brown and Maynard, wearing the reflective orange vests and carrying the guns, entered the jewelry store around 4:00pm. At the time of the robbery, only Shatima Soler-Garcia ("Soler-Garcia") and Bryanna Thornton ("Thornton") were working in the store. Brown and Maynard demanded that Soler-Garcia and Thornton open the jewelry cases and give them the jewelry. They handed Soler-Garcia and Thornton the pillowcases and directed them to put the jewelry inside.

Brown attempted to force Soler-Garcia to lay down on the floor on her stomach, but she refused because she was afraid he would shoot her and she did not want to lose sight of Thornton. Meanwhile, Maynard ushered Thornton around the store to the other jewelry cases. In total, Brown and Maynard made off with $283,000 worth of merchandise.

While Maynard continued to take items from the jewelry cases, Brown forced Soler-Garcia and Thornton to their knees. He told Maynard "to hurry up" because a UPS driver was outside the store. J.A. 155. Brown, Maynard, and the UPS driver "crossed paths" as Brown and Maynard left the store and the UPS driver came inside. *Id.* Soler-Garcia and Thornton told the UPS driver to leave the store and locked the door. Soler-Garcia then called the police, and she and Thornton waited in the back of the store until the police arrived.

11

As with the victims of the first robbery, at trial, the prosecutor asked Soler-Garcia how the robbery had affected her life. She testified:

> I don't sleep. Anybody that wears anything reflective, it's a trigger. Anybody that wears a New York Yankees hat is a trigger. . . . [I]f I get in my car, I check my surroundings. If there's a car behind me as I'm driving, I'll take a detour instead of going directly to my destination. . . . I don't really like to go out as much as I used to since this. This has messed with me emotionally; it's messed with me financially. It has taken a toll on my family.

J.A. 156. She stated that she had to quit her job at the jewelry store because "it was too much . . . . I've had panic attacks. I wasn't performing my job to the best of my ability since the incident." *Id.* at 157. Soler-Garcia further testified that she had obtained a doorbell camera at her home since the robbery that allowed her to "see the whole entire area. So I can see different cars coming and going. I can see people approaching my house before they even get there." *Id.* When asked how the robbery had affected her family, Soler-Garcia testified:

> It has affected us in a major way. Like, my kids, just try to be strong for them and not let them see me cry, not let them see me just go through my sleepless nights. Like, I still try to smile for them and not let them see my pain.

*Id.* at 158.

b.

Appellant never entered the store that day. When Brown and Maynard left the store, they "went around . . . to the side . . . where [Appellant] was waiting" for them. J.A. 262. Appellant then drove the three of them back to his apartment in Greensboro, where they

12

divided up the jewelry. After that, they returned to the jewelry store in the mall, but they were not able to sell their jewelry to Salehani.

Therefore, the following day, Appellant and Maynard drove to New York City to attempt to sell the jewelry. While they were on the way, Appellant talked on the phone with Baldwin, who was still incarcerated. Again, the jailhouse phone conversation was recorded. Although Appellant and Baldwin appeared to discuss a basketball game, Maynard testified that they were really discussing the robbery: "that's what he meant by whoever he said got spooked and didn't want to do it, so he put me and [Brown] in the game. And we robbed it in the last quarter with two seconds left. And I scored a three-pointer, meaning that we scored; we won; we did the robbery; the robbery was successful." J.A. 374. Appellant and Maynard could not sell their jewelry in New York, either, so they returned to Greensboro the same day. They ultimately went back to the mall and sold their jewelry to Salehani.

4.

Events Following Robberies

On December 4, 2018, Appellant, Brown, Maynard, Sparks, and Chambers were indicted on five counts related to the robberies. After Appellant and Brown were arrested, while they were in jail together, Appellant tried to convince Brown to take full responsibility for planning the robberies. Appellant also wanted Brown to say that he purchased the minivan used in the Elizabeth City robbery. Appellant blamed Brown, Maynard, Chambers, and Sparks for being caught. He threatened to kill Brown's ex-girlfriend and send "hitters" to Brown's house. J.A. 269.

13

When Sparks was arrested, he at first denied knowing anything about the rings Appellant gave him as payment for the minivan because he "didn't think it was that serious." J.A. 421. Sparks also "didn't want to tell on [Appellant]" because "in the streets he's a dangerous guy." Id. Sparks felt like he had been set up because he sold Appellant the van and Appellant did not tell him about the robbery or where the rings came from. While they were in jail together, Appellant talked to Sparks about "[a] way to get around the situation . . . without [Sparks] telling [the police] that [he] sold [Appellant] the van." J.A. 425. Appellant told Sparks to tell the police that he sold the van to an individual who had since been murdered.

Ultimately, Brown and Maynard each pled guilty to Hobbs Act robbery and brandishing a firearm in furtherance of a crime of violence on April 18, 2019. Chambers pled guilty to conspiracy to commit Hobbs Act robbery and Hobbs Act robbery on July 11, 2019.

Sparks pled guilty to a superseding information on May 3, 2019. After he was released from custody in December 2019, he received word from friends that Appellant "tried to get out to the streets that [Sparks] was an informant." J.A. 428. In particular, Sparks received photographs of letters Appellant purportedly wrote that included a screenshot of Sparks's Facebook profile with the word "informant" written across his forehead. Sparks felt threatened because Appellant "made it seem the way [Sparks] told on the most dangerous people in the world; that way [he] wouldn't be here to testify against [Appellant] right now." Id. at 430. Sparks testified, "[T]he people that he's saying I told

14

on is dangerous people. He is a dangerous person. . . . I was in the streets with this guy. I know what he's capable of." *Id.* at 432.

While in jail awaiting trial, Appellant also wrote a letter addressed to Tivia Davis ("Davis") that never reached her because it was intercepted by law enforcement. The letter included copies of discovery Appellant received in this case, including a Federal Bureau of Investigation ("FBI") tactical intelligence report on Sparks that included screenshots of his Facebook page. The letter repeatedly referred to Sparks as a "lying rat" and a "snitch." S.J.A. 967, 976–78. Appellant instructed Davis to tell certain people that Sparks was an informant.

## B.

## Procedural History

On August 12, 2020, Appellant was named in a five-count superseding indictment that charged him with conspiracy to commit Hobbs Act robbery, Hobbs Act robbery, brandishing a firearm in furtherance of a crime of violence, and witness tampering. After a five-day trial, the jury found Appellant guilty on all five counts on December 11, 2020. On February 26, 2021, Appellant was sentenced to 411 months of imprisonment. He timely appealed his convictions and sentence.

## II.

## A.

## Asserted Evidentiary Errors

Appellant raises four evidentiary challenges in this appeal. First, he argues that the district court should not have permitted the victim store employees to testify about how the

robberies affected them. Second, he contends that the district court should not have allowed the victim store employees to testify that he was the decoy guy and was trying to act like he was afraid during the Elizabeth City robbery. Third, Appellant asserts that the district court should not have permitted a law enforcement agent, Daniel Robertson ("Robertson"), to testify about the meaning of the language used in the recorded telephone calls between Appellant and Baldwin. And fourth, Appellant argues that the district court should not have allowed Sparks to testify that Appellant was dangerous and should have excluded the screenshots Sparks received of photographs of letters saying that he was an informant.

We agree with Appellant that the district court erred when it allowed the victim store employees to testify about how the robberies affected their lives and when it allowed Robertson to interpret the recorded phone calls. But we hold that the district court properly permitted the victim store employees to testify that Appellant was the decoy guy and was trying to act like he was afraid during the Elizabeth City robbery. We further hold that the district court appropriately allowed Sparks to testify that Appellant was dangerous and admitted the screenshots Sparks received of the photographs of the letters saying that he was an informant.

1.

Victim Impact Testimony

Appellant argues that the testimony of the employees working at the jewelry stores at the time of the robberies as to how the robberies impacted them was not relevant to the

16

issue of whether he was involved in planning the robberies, or if it was relevant, it was unfairly prejudicial because of the emotional response it would elicit in the jurors.

"Irrelevant evidence is not admissible." Fed. R. Evid. 402. "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence[] and . . . the fact is of consequence in determining the action." Fed R. Evid. 401. "The governing hypothesis of any criminal prosecution, for the purpose of determining relevancy of evidence introduced, consists of elements of the offense charged and any relevant defenses raised to defeat criminal liability." *United States v. Lamberty*, 778 F.2d 59, 60–61 (1st Cir. 1985) (citing *United States v. Hall*, 653 F.2d 1002, 1005 (5th Cir. Unit A Aug. 1981)).

"A Hobbs Act violation requires proof of two elements: (1) the underlying robbery or extortion crime, and (2) an effect on interstate commerce." *United States v. Strayhorn*, 743 F.3d 917, 922 (4th Cir. 2014) (quoting *United States v. Williams*, 342 F.3d 350, 353 (4th Cir. 2003)). The Hobbs Act defines "robbery" as:

> the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or *fear of injury*, immediate or future, to his person or property, or property in his custody or possession, or the person or property or a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

18 U.S.C. § 1951(b)(1) (emphasis supplied).

The Government argues that "evidence of what the store employees felt is probative of whether a reasonable person would have been afraid under the same circumstances."

17

Government's Br. at 31. In so arguing, the Government seemingly contends that the victim store employees' testimony bears on whether they feared injury. But as Appellant points out, the robberies were committed using firearms. Moreover, the Government elicited testimony about what the store employees were thinking and feeling *during* the robbery, such that testimony about how the robbery impacted them afterward was -- at best -- unnecessary. Specifically, Bene testified that when Brown was handcuffing her during the Elizabeth City robbery, she thought she was "going to die," J.A. 80, and Soler-Garcia testified that when Brown asked her to lay down on her stomach during the Garner robbery, she refused because she "didn't want him to put a bullet in the back of [her] head," *id.* at 154–55.

Perhaps the testimony about how Bene lost her marriage and her children, Swain was afraid to leave her home, and Soler-Garcia tried to go back to work but had to quit her job because she had panic attacks helps to demonstrate that the robberies were traumatizing for the store employees -- more akin to a victim impact statement at sentencing. But it is only minimally relevant to proof of an element of the crime charged -- the store employees' fear of injury during the robbery. *United States v. Hendricks*, 921 F.3d 320, 329 (2d Cir. 2019) ("Where -- as here -- the testimony concerns impact weeks and months after the crime had undisputedly ended, it likely is only minimally probative of whether [the defendant] acted 'by intimidation' *during* the robbery.").

Further, we have suggested that a Hobbs Act robbery victim's statements during trial about how the robbery "destroyed" his life did not warrant a mistrial, in part because it did not "directly pertain to any issue committed to the jury about [the defendants'] guilt."

*United States v. Taylor*, 942 F.3d 205, 222 (4th Cir. 2019). The victim's "outburst" on the stand, although not in response to a question counsel for one of the defendants asked him, was strikingly similar to the testimony at issue in this appeal. The victim stated:

> This destroyed my whole family. I am in a divorce process right now because of this bullshit. This destroyed my whole f--kin' [sic] family, man. . . . Everbody's life is destroyed, man. . . . The fact of the matter is, came in my house, destroyed my family. I'm in a divorce process because of this. Because of this. This has put so much financial pressure on my family. Kids, man, are scared to go in the house because of this.

*Id.* at 221. That the victim's "outburst" in *Taylor* was not so related to the Hobbs Act robbery offense charged in the indictment as to warrant a mistrial suggests that the similar testimony of the victim store employees elicited by the Government at the trial in this case is not relevant and should not have been admitted into evidence. Therefore, the district court erred when it allowed the victim store employees to testify about the robberies' long-term effects on their lives.

2.

Store Employees' Perception of Appellant's Role in First Robbery

Next, Appellant argues that the district court should not have admitted Bene's testimony that Appellant was the decoy guy and Swain's testimony that Appellant was trying to act like he was afraid during the Elizabeth City robbery because those statements are improper lay opinions.

19

To be admissible, lay opinion testimony must be (1) "rationally based on the witness's perception"; (2) "helpful to clearly understanding the witness's testimony or to determining a fact in issue"; and (3) "not based on scientific, technical, or other specialized knowledge" that is more properly classified as expert testimony. Fed. R. Evid. 701. Appellant asserts that Bene's and Swain's testimony was not rationally based on their observations during the robbery because he questions their abilities to think rationally during the "brief and chaotic time" Brown and Maynard were robbing the store. Appellant's Opening Br. at 34. To the contrary, Bene and Swain explained why they held those beliefs, and their testimony indicates that their opinions were "based on [their] reasoning and opinions about witnessed events," which is the hallmark of lay opinion testimony. *United States v. Offill*, 666 F.3d 168, 177 (4th Cir. 2011); *see United States v. Farrell*, 921 F.3d 116, 143 (4th Cir. 2019) ("[L]ay testimony must be based on personal knowledge." (internal quotation marks omitted)).

Specifically, Bene testified upon direct examination that Appellant did not seem "interested" in the engagement rings he was asking about, and "he stood very far back from the cases." J.A. 76. She stated that Appellant "made [a] little noise and threw his hands up" when Brown and Maynard came back into the jewelry store with guns. *Id.* at 77. Bene also testified that Appellant did not leave the store "right then," and when he did leave, Bene "thought he was going to get us help," but no help came. *Id.* at 77–78. Therefore, Bene explained, in response to Appellant's counsel's question about whom she thought was "the leader," that she believed Appellant "was the decoy guy, or we would have had

help." *Id.* at 89. This testimony demonstrates that Bene's statement that Appellant was the decoy guy was indeed based on her observations at the time of the robbery.

For her part, Swain testified that she "had walked up to the counter to get [Appellant] a business card" when Brown and Maynard came back into the store, and Appellant was following her. J.A. 119. But according to Swain, when Brown and Maynard walked in, Appellant "walked over to the other side of the store, kind of put his hands up just a little bit trying to, in my opinion, act like he was afraid." *Id.* She explained that Brown and Maynard said, "[d]on't move," but Appellant "still walked right out the front door." *Id.* at 120. Swain thought that Appellant "was going to get us help" when he left, but help did not arrive "until [Swain] called 9-1-1 when everything was over and done with." *Id.* Swain's testimony indicates that her statement that Appellant was trying to act like he was afraid was based on her observations at the time of the robbery.

Appellant also argues that Bene's and Swain's statements were not helpful to the jury because the surveillance video from the Elizabeth City robbery was played during the trial, and, therefore, the jury could judge the situation for themselves. However, as the Government points out, "the video has no sound and was taken from a high angle." Government's Br. at 37–38. Appellant is correct that "the absence of sound does not undercut the value of the recordings," Appellant's Reply Br. at 7, as demonstrated by the Government's reliance on the surveillance video to guide its direct examinations of Bene, Swain, Brown, and Maynard. But at the time Bene and Swain made the statements at issue, they were describing the robbery from their perspectives as the victims.

21

That fact distinguishes this case from the unpublished one upon which Appellant relies, *United States v. Adkins*, 993 F.2d 1539 (4th Cir. 1993) (per curiam) (table), 1993 WL 172862.[4] In *Adkins*, a police officer slapped a man while trying to arrest him, and we held that a witness's testimony that the officer "only struck [the man] in an effort to quiet him" was not helpful to the jury because the jury could form its own opinions about the officer's intent from viewing the video recording of the incident and hearing the testimony of two witnesses. 1993 WL 172862, at *1. In other words, the jury in *Adkins* was "essentially in the same position as [the witness] to determine [the officer's] intent" because the witness was a bystander to the incident. *Id.* Notably, there is no indication that the victim in *Adkins* testified at trial. Here, by contrast, Bene and Swain offered a unique viewpoint of the robbery that is not reflected in the surveillance video. Therefore, their statements were properly admitted as lay opinions.

3.

Law Enforcement Agent's Interpretation of Recorded Jail Calls

Appellant also asserts that the district court should have excluded Robertson's testimony about the meaning of specific phrases in the July 12, 2018 and October 12, 2018 recorded phone calls between Appellant and Baldwin because Robertson's testimony does not qualify as admissible lay opinion. Specifically, Appellant argues that Robertson cannot testify about the meaning of a conversation to which he was not a party and that because

---

[4] Not only is *Adkins* distinguishable, but because it is unpublished, it is also not precedential. *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 545 n.4 (4th Cir. 2019) ("Unpublished decisions . . . do not constitute binding precedent in this Circuit.").

22

he did not participate in the conversation, Robertson was in no better position than the jury to decipher what Appellant meant when he made the statements at issue. We agree with Appellant.

A law enforcement agent may offer opinion testimony about his interpretation of recorded communications that is based solely on his experience and training, regardless of whether he investigated the case. *United States v. Smith*, 919 F.3d 825, 835–36 (4th Cir. 2019); *United States v. Galloway*, 749 F.3d 238, 245 (4th Cir. 2014) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). But to offer such testimony as a lay opinion, the agent's testimony must be based on "his observations from the surveillance employed in [the] case," rather than "information from interviews with suspects and charged members of the conspiracy after listening to the phone calls." *United States v. Johnson*, 617 F.3d 286, 293 (4th Cir. 2010) (emphases deleted). Stated another way, "testimony regarding a witness's understanding of what the defendant meant by certain statements is permissible lay testimony, so long as the witness's understanding is predicated on his knowledge and participation in the conversation." *United States v. Hassan*, 742 F.3d 104, 136 (4th Cir. 2014). But a law enforcement officer's "narrative gloss that consist[s] almost entirely of her personal opinions of what the conversations meant . . . based on her investigation after the fact, not on her perception of the facts" is not admissible. *Johnson*, 617 F.3d at 293 (quoting *United States v. Peoples*, 250 F.3d 630, 640–41 (8th Cir. 2001)).

Robertson's testimony about his interpretation of certain language used in the recorded telephone calls between Appellant and Baldwin should not have been admitted as

23

lay opinion testimony. We recognize that Robertson was "the lead case agent investigating this case since its inception," J.A. 556, and that he "listened to [the calls between Appellant and Baldwin] personally," *id.* at 590. However, because Robertson did not participate in the conversation or listen to it while it was happening, the danger is great that the interpretations he offered at trial were not based on his contemporaneous understanding of the language used but instead the result of his putting the pieces together based on what he discovered during his investigation. This is especially apparent with regard to Robertson's testimony about the October 12, 2018 call: Robertson testified that it "didn't make sense" that Appellant "would be so cryptic about something as seemingly innocuous as a basketball game," and therefore, the basketball game "was code for discussion of the robbery." J.A. 597. The jury, if it were so inclined, could have reached this conclusion on its own, without Robertson's personal opinion about the meaning of the conversation, which aligned with the Government's theory of the case.

The same is true with regard to Robertson's testimony about the meaning of certain language in the July 12, 2018 call. Robertson's insistence that Appellant's use of the word "mission" was a reference to "a robbery that's being planned" is mere speculation absent the information Robertson discovered afterward while investigating this case. J.A. 596. Moreover, the jury, hearing all the evidence the Government presented, did not need Robertson to tell them that Appellant "meant that [he had] a leadership role" when he said he had "to go in because it's [his] lineup." *Id.* at 592–93. The jury also did not need Robertson to tell them that Appellant's statement that "[w]e going straight to the back room" meant "that there was a specific plan when a robbery was going to be conducted

24

that they were going to go back to a back room that they had decided on." *Id.* at 595. To permit a law enforcement officer to testify in the manner Robertson did here is to bolster the Government's theory of the case with the imprimatur of law enforcement, which is improper. *See Smith*, 919 F.3d at 837 ("[D]istrict courts must be vigilant to avoid the danger of confusing the jury [or prejudicing the defendant] when a case agent testifies . . . ."). As such, the district court erred when it failed to exclude this testimony.

We again reiterate that "post-hoc assessments cannot be credited as a substitute for the personal knowledge and perception required under Rule 701." *Johnson*, 617 F.3d at 293. Therefore, if the Government seeks to introduce a law enforcement agent's testimony about statements made during recorded telephone calls and the agent was neither a party to the conversation nor contemporaneously listening to the conversation, the law enforcement agent should generally be proffered as an expert witness. And the expert testimony he offers must qualify as expert testimony, such as defining slang words used in the conversation, that the jury would not be able to decipher on its own. *Id.* at 294 ("Experts must have specialized knowledge that will assist the trier of fact, and the knowledge, skill, experience, training and education that qualifies them on the subject of their testimony." (citing Fed. R. Evid. 702)); *United States v. Wilson*, 484 F.3d 267, 278 (4th Cir. 2007) (holding that district court erred when it failed to exclude expert testimony "interpret[ing] language that needed no interpretation").

## 4.

### Screenshots Sent to Sparks and Testimony About Dangerousness

Appellant argues that the district court should not have permitted Sparks to testify about how Appellant was trying "to get out to the streets that [Sparks] was an informant," J.A. 428, or admitted into evidence the screenshots of photographs Sparks received of letters saying that he was an informant. Appellant asserts that this evidence was not relevant because the Government failed to connect him to it, since the letter he admits he wrote to Davis calling Sparks an informant, a snitch, and a liar was never delivered.

Although Appellant frames his argument as a relevance issue, it more closely resembles an authentication issue. Indeed, inherent in Appellant's argument is his implicit agreement that if the Government connected him to the screenshots, then that evidence "would be relevant to show the intimidation of a witness." Appellant's Opening Br. at 42. More importantly, when the Government first sought to introduce the evidence at trial, Appellant essentially made an authentication objection. His counsel asserted, "Your Honor, I don't have an idea who this is from and where it's coming from. I don't know anything about this." J.A. 428.

The Government adequately established that the screenshots of the photographs Sparks received depicted letters from Appellant. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). The Government argues that "[a]mple circumstantial evidence connected [Appellant] to the documents in the screenshots." Government's Br. at 43. Specifically,

26

the Government points to the fact that one of the screenshots "appeared to be a modification of a document [Appellant] received in discovery [in this case], specifically an FBI tactical intelligence report about Sparks containing social media photographs." *Id.* at 44. At trial, the Government connected that screenshot to Appellant by introducing testimony from Robertson that the images in the screenshot and in a page from the letter Appellant admits he wrote to Davis "appear to be similar":

> Just from the inset photograph, the one in the circle appears to be similar. I recognize Mr. Sparks, and then the inset photograph in the background seems similar to me.

J.A. 588. Robertson testified that the page from the letter "is a portion of what we call a Tactical Intelligence Report." *Id.* at 578. His personal knowledge about the report and the comparison of the two images is sufficient to demonstrate that the screenshot was authentic. *See* Fed. R. Evid. 901(b)(1), (4).

As for the other screenshot, which is a photograph of a letter purportedly written on December 23, 2019, the jury was capable of concluding on its own that the letter was written by Appellant. "[T]he trier of fact" may authenticate a document by comparing it "with an authenticated specimen" like the intercepted letter Appellant admits he wrote to Davis. Fed. R. Evid. 901(b)(3). For instance, the jury could compare the handwriting in both letters. *See United States v. Dozie*, 27 F.3d 95, 98 (4th Cir. 1994) (per curiam). The jury could also compare the similar words and phrases used in and the similar content of both letters. Fed. R. Evid. 901(b)(4). If the jury were to find that the documents depicted in the screenshots came from Appellant, then even Appellant would seem to agree that the

27

threats therein "would be relevant to show the intimidation of a witness." Appellant's Opening Br. at 42. The same is true of Sparks's testimony that the documents depicted in the screenshots came from Appellant.

Appellant also argues that Sparks's testimony that Appellant is dangerous was irrelevant and should have been excluded. But as the Government points out, "Sparks's assessment that [Appellant] was a dangerous person was relevant to understanding the importance of the screenshots and how they related to the witness tampering charges." Government's Br. at 46. Witness tampering involves "intimidation," "threat[s]," or "corrupt[] persua[sion]," 18 U.S.C. § 1512(b), and Sparks's explanation of why he felt threatened by Appellant's branding him as an informant bears on whether Appellant engaged in witness tampering. *United States v. Maggitt*, 784 F.2d 590, 593 (5th Cir. 1986) ("[W]hether a threat had a reasonable tendency to influence the witness is relevant in determining an accused's state of mind [on a witness tampering charge]." (citing *United States v. Harris*, 558 F.2d 366, 369 (7th Cir. 1977))).

Appellant nonetheless contends that even if Sparks's testimony "had any relevance, that relevance was substantially outweighed by the risk of unfair prejudice that accompanied this testimony." Appellant's Opening Br. at 43. Appellant does not elaborate on why that is so, but given that the testimony is probative of witness tampering, "the balance under [Federal Rule of Evidence] 403 should be struck in favor of admissibility." *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996). "Evidence is unfairly prejudicial and thus should be excluded under Rule 403 'when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and . . . this risk is

28

disproportionate to the probative value of the offered evidence.'" *United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006) (quoting *Aramony*, 88 F.3d at 1378). As the Government points out, the jury had already heard Brown's testimony -- without objection from Appellant -- that Appellant "was under the impression that . . . an ex-girlfriend of [Brown's] turned us in," threatened "to send those hitters at her," and "told [Brown] what [Brown's] apartment looked like" even though Appellant "had never been in [Brown's] place." J.A. 269–70. The jury also heard Appellant's own testimony that he spent 14 years on death row for first-degree murder and later pled guilty to conspiracy to commit and accessory after the fact to murder. Sparks's testimony therefore did not "paint[]" Appellant "darker than he already must have appeared." *United States v. Bellinger*, 652 F. App'x 143, 152 (4th Cir. 2016) (per curiam) (quoting *United States v. James*, 169 F.3d 1210, 1215 (9th Cir. 1999) (en banc)). Any risk of unfair prejudice is minimal.

In sum, the district court properly admitted into evidence the screenshots Sparks received of photographs of letters branding him as an informant and did not err when it allowed Sparks to testify that he believed Appellant was dangerous.

B.

Review of Evidentiary Errors

"We review a district court's decision to admit or exclude evidence [over the defendant's objection] for an abuse of discretion." *United States v. Simmons*, 11 F.4th 239, 261 (4th Cir. 2021). But even when the district court abuses its discretion, its "[e]videntiary rulings are . . . subject to harmless error review." *United States v. Caldwell*, 7 F.4th 191,

204 (4th Cir. 2021). "[A]n error is harmless if it's 'highly probable that it did not affect the judgment.'" *Id.* (quoting *United States v. Burfoot*, 899 F.3d 326, 340 (4th Cir. 2018)).

When a criminal defendant fails to object to the district court's evidentiary rulings at trial, we review for plain error. *United States v. Johnson*, 945 F.3d 174, 177 (4th Cir. 2019). "There is plain error only when '(1) an error was made; (2) the error is plain; (3) the error affects substantial rights; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Fall*, 955 F.3d 363, 373 (4th Cir. 2020) (quoting *United States v. Harris*, 890 F.3d 480, 491 (4th Cir. 2018)). "A plain error normally affects a defendant's substantial rights if the error was prejudicial, meaning that it 'affected the outcome of the district court proceedings.'" *United States v. Hardy*, 999 F.3d 250, 254 (4th Cir. 2021) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)).

Here, we review the district court's admission of the victim store employees' testimony about how the robberies impacted their lives for plain error because Appellant did not object to this testimony at trial. The parties disagree about whether we review the district court's admission of Robertson's testimony interpreting the language used in the recorded phone calls for plain error or for abuse of discretion, but we need not decide which standard of review applies because the result is the same under either standard.

Succinctly, Appellant has not demonstrated that the district court's evidentiary errors affected the trial's outcome. The Government presented such a strong case against Appellant that these errors were not sufficient to create a reasonable doubt and warrant acquittal.

The Government connected Appellant to the vehicle -- the Mazda minivan -- that was used in the Elizabeth City robbery on July 28, 2018. Sparks testified that Appellant approached him wanting to buy a vehicle, and even Appellant testified that Sparks was "known for having vehicles." J.A. 628. Brown testified that he first saw the van the morning of the robbery in the parking lot of Appellant's apartment complex. Maynard testified that he first saw the van the day before the robbery, but he could not recall where. Both Brown and Maynard testified that the van had a busted left driver's side back window with a bag over it. Sparks testified that the van had a "shattered window," *id.* at 412, because it "got shot up," *id.* at 408. He also testified that Appellant paid him for the van with four rings, which he pawned on August 2, 2018. The Government presented evidence demonstrating that those rings came from the Kay Jewelers in Elizabeth City. Appellant did not meaningfully counter this evidence; he merely testified that the van belonged to "Sparks, Maynard, and Brown," *id.* at 635, and that he "never bought no van from Sparks," *id.* at 637.

As Appellant acknowledges, the Government also introduced evidence to corroborate Brown's and Maynard's testimony about how the Elizabeth City robbery occurred. Brown and Maynard testified that Appellant initially planned to rob a Rolex store in Virginia Beach, and they spent the night at Appellant's apartment in Greensboro before heading toward Virginia Beach together on the morning of July 28, 2018. The Government presented cellular analysis and GPS tracking data demonstrating that Appellant, Chambers, Brown, and Maynard were traveling closely together the whole route. The Government also presented cellular analysis and GPS tracking data showing

31

that they traveled together from Norfolk to Elizabeth City. Appellant testified that he left Greensboro with a group of people -- including Chambers, Brown, and Maynard -- headed toward Virginia Beach because he was going to see a friend with Chambers, and Brown and Maynard were, coincidentally, at the same mall.

Appellant further testified that he and Chambers stopped in Elizabeth City because Chambers wanted to buy some shoes, and Brown and Maynard "pulled up" and robbed the Kay Jewelers there. J.A. 637. The Government introduced traffic camera footage showing that Appellant's Mercedes SUV and the Mazda minivan arrived at the Elizabeth City shopping center at the same time, with the minivan following the SUV. Appellant testified that he went inside the Kay Jewelers while he was waiting on Chambers because he "wanted diamonds put in [his] medallion" and that he was talking to Swain and Bene about rings when Brown and Maynard came in the store to rob it. *Id.* at 639. The Government presented evidence that Appellant was on the phone with Maynard the whole time.

The Government also introduced evidence that Appellant, Chambers, Brown, and Maynard were together after the Elizabeth City robbery. Appellant testified that his vehicle ran out of gas on the way back to Greensboro, and he and Chambers were walking to a gas station when Brown and Maynard "pull[ed] up in a dark-colored car" and asked Appellant and Chambers if they wanted a ride. J.A. 643. Appellant testified that they declined the ride, but Brown and Maynard went back to Appellant's vehicle on the side of the highway before the officer showed up. Appellant further testified that Brown and Maynard followed him and Chambers to the gas station after the officer brought Appellant and Chambers back to Appellant's vehicle. The Government presented cellular analysis and GPS tracking data

32

demonstrating that Appellant, Chambers, Brown, and Maynard convened in Edenton -- the location where the minivan was abandoned in the fast-food restaurant parking lot -- and ended up together in Zebulon, where Appellant's vehicle ran out of gas. That same data also showed that after leaving the gas station, the foursome "went back west on 64 before returning east on 64 back to an area . . . before eventually moving west on 64 and going back to Greensboro." J.A. 520. This is consistent with Brown's and Maynard's testimony that they returned to the spot where they hid the jewelry and guns -- marked with a phone charger tied around a tree, which the police later located in that same spot -- before returning to Greensboro together.

The Government also presented evidence connecting Appellant to the Garner robbery. Appellant admitted that his vehicle was in the photograph the cellphone store employee took on October 7, 2018, four days before the robbery, but he testified that he was in Garner visiting "a female" and "might have been there to go to Chipotle." J.A. 648. The Government introduced cellular analysis data indicating that Appellant was near the jewelry store at 11:37am and between 5:00pm and 6:00pm that day. Appellant also testified that he was in Garner on October 11, 2018, the day of the robbery, but he insisted that his "car wasn't in that area" because it "was being maintenanced [sic] on." *Id.* The Government introduced cellular analysis data from that date showing that Appellant and Brown were communicating at 4:00pm, around the time the robbery occurred, and that they were both in the area of the jewelry store.

In short, the evidence presented against Appellant was overwhelming. Therefore, contrary to Appellant's contention, the Government's case against him was not so

33

precarious that emotional testimony from the victim store employees or improper lay opinion testimony from Robertson was likely to tip the jury over the edge to convict him.

## III.

## A.

## Motions for Judgment of Acquittal at Trial

During the trial, Appellant twice moved pursuant to Federal Rule of Criminal Procedure 29 for a judgment of acquittal on the witness tampering count, arguing that the Government had not presented "any evidence whatsoever to support that allegation." J.A. 608. The district court denied both motions for the same reasons. Specifically, the district court explained:

> To proceed on that charge to conviction, the government has to prove two things beyond a reasonable doubt: The first, that the defendant, Mr. Walker, knowingly intimidated, threatened, or used corrupt persuasion against a witness identified as Mr. Sparks, and the defendant did so intending to influence, delay, or prevent the testimony of that person in an official proceeding. And the charge is lodged from a time around January 17th . . . until March 30th of 2020.

*Id.* After hearing argument from both sides, the district court concluded:

> Well, I have to take the evidence in the light most favorable to the government in deciding this motion. Clearly that's not what the jury will do, but that's what the Court has to do under law. And even if a reasonable person may have a reasonable doubt as to guilt, the case should still be submitted to the jury.
>
> I think with respect to the [witness tampering] count and the two elements involved, your argument does neglect in some part the actual testimony of Mr. Sparks from the witness stand.

34

I believe there's enough evidence to send all five counts to the jury under the standard in Rule 29.

*Id.* at 611.

## B.

Sufficiency of Evidence on Witness Tampering Count

When assessing "a challenge to the sufficiency of evidence," we "view[] the evidence in the light most favorable to the prosecution and decide[] whether substantial evidence -- that is, evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt -- supports the verdict." *United States v. Young*, 916 F.3d 368, 384 (4th Cir. 2019) (internal quotation marks omitted). "[T]his standard presents a 'heavy burden'" for a defendant to overcome. *United States v. Ath*, 951 F.3d 179, 185 (4th Cir. 2020).

Appellant was charged with witness tampering, including attempted witness tampering, pursuant to 18 U.S.C. § 1512(b), which requires proof that a defendant (1) "knowingly" (2) "use[d] intimidation, threaten[ed], or corruptly persuade[d] another person, or attempt[ed] to do so, or engage[d] in misleading conduct toward another person," (3) with the intent that the person take one of the actions enumerated in the statute. *See United States v. Edlind*, 887 F.3d 166, 172–73 (4th Cir. 2018). As relevant in this case, the superseding indictment alleges that Appellant intended to:

> influence, delay, and prevent the testimony of another person in an official proceeding, that is, testimony before a federal trial jury; cause and induce another person to withhold testimony from such official proceeding; and hinder, delay, and prevent the communication to a law enforcement officer of information

35

> relating to the commission and possible commission of a Federal offense.

J.A. 35–36. The parties agree that Sparks is the witness who is the subject of the charge, even though he is not identified in the superseding indictment.

Appellant argues that the district court should have granted his motions for acquittal because he asserts that the Government rests its case on the letter he wrote from jail that was intercepted by law enforcement and never delivered to Davis, the intended recipient. But the fact that the letter was intercepted and never delivered is a distinction without a difference. To result in a conviction, the alleged witness tampering need not be successful: 18 U.S.C. § 1512(b) applies equally to a defendant's "attempts" to engage in witness tampering. *See United States v. Maggitt*, 784 F.2d 590, 593 (5th Cir. 1986) ("In determining whether a threat was intended to influence future conduct under 18 U.S.C. § 1512, it is the endeavor to bring about a forbidden result and not the success in actually achieving the result that is forbidden." (first citing *United States v. Jackson*, 513 F.2d 456, 460 (D.C. Cir. 1975); and then citing *United States v. De Stefano*, 476 F.2d 324, 330 (7th Cir. 1973))). Indeed, the superseding indictment charged Appellant with attempted witness tampering pursuant to 18 U.S.C. § 1512(b).

Although Appellant testified that he "wrote the letter to let [Davis] know [that he] and Joey Chambers was [sic] innocent" and that Sparks "was telling lies, numerous lies on [Appellant and Chambers]," J.A. 660, the letter is not so innocuous. In the letter, Appellant repeatedly asks Davis to tell others -- including an individual whom Appellant confirmed was a member of a gang -- that Sparks is an informant, a snitch, and a liar. The jury was

free to believe that in writing the letter, Appellant intended to make sure Sparks was not around to testify against him in this case -- and it likely did so in finding Appellant guilty of witness tampering.

Moreover, just as he did below, Appellant ignores other evidence the Government offered of his attempts to prevent Sparks from incriminating him in the robberies -- namely, the screenshots Sparks received of photographs of other letters branding him as an informant and Sparks's testimony about those screenshots. Although the screenshots are not themselves dated, the letter depicted in one of the screenshots is dated December 23, 2019, shortly before the relevant period identified in the superseding indictment. Appellant admits he wrote the letter that was intercepted by law enforcement which corresponds to the relevant time period. And there are striking similarities between the letter and the documents in the screenshots. Further, Sparks testified that after he was released, he "had friends screen shot and show [him] messages, the way [Appellant] tried when he was locked up . . . to get out to the streets that [Sparks] was an informant, stay away from [him]." J.A. 428. Given all of this, the jury could reasonably infer that Appellant sent other, similar letters during the relevant period that had the same purpose as the letter that was intercepted. In other words, the intercepted letter, the screenshots, and Sparks's testimony could reasonably support the jury's guilty verdict in this case.

IV.

For the foregoing reasons, we affirm Appellant's convictions.

*AFFIRMED*